[No. 14054.   Department One. — September 10, 1891.]

M. KREAMER, SPECIAL ADMINISTRATOR, ETC., RESPONDENT, *v.* D. ALBERT EARL ET AL., APPELLANTS.

CONTRACTS — ILLEGALITY — AGREEMENT TO PROCURE STATE TITLE — CONTRAVENTION OF LAND LAWS — SPECIFIC PERFORMANCE. — An agreement the purpose of which is to secure from the state large tracts of land through the applications of other persons in a manner unauthorized by law, and which contravenes the spirit and policy of the land laws of the state in force at the time of its execution, is illegal and void, and will not be specifically enforced. The parties being *in pari delicto*, the court will leave them where it finds them.

ID. — ILLEGALITY BY IMPLICATION — CONTRAVENING POLICY OF LAW. — No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication. It is not necessary that any statute should expressly declare the contract void; but if, upon review of all the state legislation upon the

subject, the contract appears to contravene the design and policy of the laws, a court of equity will not enforce it.

ID. — REFUSAL OF RELIEF — VOLUNTARY ACTION OF COURT. — Although no objection is made by either party, when the court discovers a fact which indicates that the contract is illegal and ought not to be enforced, it will, of its own motion, instigate an inquiry in relation thereto.

ID. — APPEAL — REVERSAL — DISMISSAL OF ACTION. — Where a contract specifically enforced by the court below appears from the record to be illegal, the judgment will be reversed, with direction to dismiss the action, although the appellant may not have questioned the legality of the contract.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*Del Valle & Munday*, for Appellants.

*Lee & Scott*, and *S. Haley*, for Respondent.

PATERSON, J. — This is an action to compel the defendant Earl to convey to plaintiff, who is special administrator of the estate of Henry Charles, deceased, the legal title to the northeast quarter of the northwest quarter of section 22, township 8 south, range 8 west, San Bernardino meridian, and to cancel a mortgage thereon given by Earl to his co-defendant Egan.

The facts found by the court show that in September, 1875, Henry Charles and F. P. Forster, brother of defendant M. A. Forster, claimed the right adversely to each other to acquire the title to several tracts of public land, including the land in controversy, and on that day entered into a written agreement, by the terms of which Forster agreed to convey to Charles all the right, title, and interest which he then held or might thereafter acquire in the lands described in the agreement, upon the payment to him by Charles, within sixty days, of the amount paid by Forster to Mullen & Hyde, of San Francisco, for said lands, together with interest thereon at one per cent per month. On November 8, 1875, Charles paid to Forster the sum of $1,056, which was more than enough to pay for the lands described in the agreement,

and thereupon Forster executed and delivered to Charles a deed of conveyance, including the lands in controversy. Forster had previously, for the purpose of acquiring the title to the lands described in the agreement, together with other public lands, employed Mullen & Hyde to discover portions of school sections which had been lost to the state, and to procure lands in lieu thereof, under the provisions of title 8 of part 3 of the Political Code. In pursuance of their employment, they procured one Sheldon to make an application in due form, under the provisions of the code referred to, for certain lands, including the lands in controversy, on March 5, 1875. On April 16, 1875, the surveyor-general applied to the register of the United States land-office, asking that all of the lands described in Sheldon's application be accepted in part satisfaction of the grant to the state in lieu of certain portions of school sections which had been lost to the state, and at the same time located and selected the lands described in the application for the use and benefit of the applicant. On November 15, 1875, the surveyor-general's selection was duly approved by the commissioner of the general land-office, and by the Secretary of the Interior, and thereupon the state became the owner of the lands. About the same time, Mullen & Hyde procured other persons to make applications for other portions of the land which Forster had agreed to secure and convey to Charles. Believing the application to be void because they had been made before the approval of the township plat, Mullen & Hyde procured other persons to file applications for the same lands, in March, 1876. Sheldon's application was abandoned, and one Weber filed on the lands described therein. His application was approved by the surveyor-general in December, 1880, and on February 19, 1881, the register of the land-office issued to him a certificate of purchase for the lands described in his application, including the lands in controversy. F. P. Forster died intestate, March 15, 1881, and the defendant M. A. Forster was appointed administrator in the following month. In

February, 1881, Mullen & Hyde procured Weber to execute a deed to the defendant Egan for all the lands in the Weber application. This conveyance the court finds was for the sole use and benefit of F. P. Forster, who paid the consideration and cost thereof. Egan, who was an employee of F. P. Forster, did not know of the execution of the deed until several days thereafter. On November 24, 1882, Egan conveyed the lands in controversy, with others, to M. A. Forster, it being understood that Forster would reconvey to him the forty acres in controversy. November 25, 1882, Forster reconveyed the lands in controversy to Egan. A patent was issued to M. A. Forster, December 27, 1882. March 10, 1888, Egan conveyed the forty-acre tract to Earl, in consideration of the sum of four thousand dollars, one third of which was paid in cash, and the balance was secured by the note and mortgage which plaintiff seeks to have canceled. Egan was the trustee, friend, and confidential adviser of both F. P. and M. A. Forster. He acted as the agent of F. P. in procuring the payment of the $1,056 by Charles, and never disclosed the fact that he claimed any interest in the land in controversy until within two years before the commencement of this action. All of the defendants knew of the agreement between Charles and Forster from the time it was executed, and had notice of all the facts concerning the dealings between Mullen & Hyde, the different applicants who filed on the lands, and Charles and Forster. Charles always erroneously believed, until within two years prior to the commencement of this action, that he had acquired title to the lands in controversy through the application of Clarke and Cavanaugh, the certificate of purchase issued to them and assigned to him, and the patent issued by the state to him for the lands described in their application. Hyde procured the deed from Weber to Egan, to be made to Egan as the agent of Forster, and Egan received it in trust for, and for the sole use and benefit of, Forster, who paid the consideration, fees, and expenses on account thereof through Mullen

& Hyde. The purchase price of the land was paid to the state by Egan from his own funds. Charles occupied the lands in controversy exclusively, and used the same for pasture from the time of the agreement with Forster to April 1, 1883. From April 1, 1883, to March 30, 1888, the date of the commencement of this action, he used the land in the same manner in connection with other lands, except that in 1885 and 1886 Egan's tenants, who it appears were also tenants of the plaintiff, used the land for pasturage. Egan purposely concealed from Charles the fact that he had procured a deed from Weber for the forty-acre tract.

It is apparent from the facts stated above, and taken from the findings of the court, that the purpose of the agreement between Charles and Forster was to secure from the state large tracts of land in a manner unauthorized by law. The lands described in the written agreement amounted to 398.46 acres, and the quantity claimed by each adversely to the other was 463.27 acres. The statute under which they proposed to acquire title to the lands requires the applicant to make an affidavit that he is a citizen of the United States, or has filed his intention to become such, and a resident of the state of lawful age; that he desires to purchase the lands, and there is no valid claim to the same, other than that of the applicant; that he has not entered any land in part satisfaction of the grant in lieu of sixteenth and thirty-sixth sections, which, together with that now sought to be purchased, exceeds 320 acres. There is no doubt that the contract contravenes the spirit and policy of the land laws of this state. The application and purchase authorized by section 3500 of the Political Code are intended for the benefit of the applicant himself. "This was distinctly the policy of the act, a policy adopted to prevent the acquisition of large tracts of land by one person, through the use of other persons. . . . . If such evasion of the statute as is attempted in this case should be allowed, it would be a very easy matter for one who had acquired under the laws above mentioned 640 [here 320] acres, and

therefore could not take the oath prescribed, by the employment of others who could take the oath, to acquire for himself, in manifest disregard of the intent and policy of the act, many times 640 [here 320] acres." (*McGregor* v. *Donelly,* 67 Cal. 150.) It is not necessary that the act itself, or any other act, should declare in express words such a contract to be void. If, upon a review of all the state legislation upon the subject, such a contract appears to contravene the design and policy of the laws, a court of equity will not enforce it. (Civ. Code, sec. 1667; *Dial* v. *Hair,* 18 Ala. 800; 54 Am. Dec. 179; *Smith* v. *Johnson,* 37 Ala. 636.) "No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication." (*Damrell* v. *Meyer,* 40 Cal. 170.) The parties being *in pari delicto,* the court will leave them where it finds them. (Waterman on Specific Performance, sec. 207.) Our land laws are intended to benefit actual settlers; to encourage the immigration of industrious people, and enable them to build homes; to place the lands of the state beyond the reach of speculators. If we hold this contract not to be in violation of the spirit of the law, we shall sanction a contrivance by which one, though not an actual settler, or even a resident of the state, can acquire any quantity of land under the act. There is nothing in the record to show that Charles was a citizen of the United States, or possessed of any of the qualifications necessary to entitle him to purchase land from the state. If he is entitled to the relief he seeks in this action, it must be by virtue of the terms of the written contract, and not by virtue of any oral agreement, or of any trust relation existing between him and Egan, or between Egan and Forster.

There is enough in the record to indicate that the land in controversy is agricultural land, and fit for cultivation. If it is, no one was entitled to purchase it who was not an actual settler thereon. There seems to be no pretense that the plaintiff was ever an actual settler on the land. Our constitution provides that "lands belonging to this

state which are suitable for cultivation shall be granted only to actual settlers, and in quantities not exceeding 320 acres to each settler," and this provision governs applications made prior to the time when the constitution took effect. (*Manley* v. *Cunningham,* 72 Cal. 240; Waterman on Specific Performance, sec. 207; *Brake* v. *Ballou,* 19 Kan. 402.) But whether the lands were fit for cultivation or not, the agreement upon which plaintiff relies for a specific performance contravenes the provisions of the statutes which were in force at the time it was executed, and no recovery can be had upon it.

It may be suggested that the appellant has never questioned the legality of the contract, and that we ought not to make the point for him. As a general rule, cases should not be reversed upon points which the respondent has not had an opportunity to discuss; but in cases of this kind the court is bound to satisfy its own conscience, and cannot shut its eyes to the fact, although it is not put in issue. A court of equity will not allow itself to become a handmaid of iniquity of any kind. It intervenes, not for the sake of the party who is benefited by the intervention, but for the sake of the law itself. It matters not that no objection is made by either party; when the court discovers a fact which indicates that the contract is illegal and ought not to be enforced, it will, of its own motion, instigate an inquiry in relation thereto. (*Valentine* v. *Stewart,* 15 Cal. 405; Pomeroy on Contracts, sec. 286.)

Judgment and order reversed, with directions to the court below to dismiss the action.

Harrison, J., and Garoutte, J., concurred.

Hearing in Bank denied.